So 141538 and 141549, Progressive Casualty v. Liberty Mutual. Are you going to help me out here, Mr.? Sobering. Okay. I need to change the wire. Do you want to start off by refreshing us, since you've had so many different cases, about what the main issue is in this one? Yes. The main issue in this case are whether the board correctly construed the claim term real-time. They used an IEEE dictionary of real-time to construe the claim. And that real-time, that definition from the IEEE dictionary used the term external process, which was a vague term. And our position was that what the board failed to do was to give that term meaning in the context of intrinsic evidence and the other evidence of record. Before we get to that, Mr. Sobering, I'm going to lose a little time. So I want to turn your attention to page 3 of the blow-break in 1549. And I know it's the same as the other one. And that is, it says, Progressive has long been recognized as an innovator in the delivery of auto insurance information and customer service by the Internet. And you cite to A2324 for that proposition. Yes, I'm sorry. Are you familiar with that site, the page to which you're citing? Generally, yes. Okay. It reads to me sort of like a press release. What's the underlying basis for that? I think it is a press release. I think it's a press release, too, because it's on PR Newswire, which is a website which contains only press releases. So as the basis for a statement in your brief, you're citing to a press release that you issued? For general context, Your Honor. For general context. I find that at least close to improper.  This was in the record. We felt it added context. With respect to the issues, so the other two issues are there was a lack of substantial evidence to support the obviousness conclusion. And the board applied 20-20 hindsight to a few crimes. Let's turn to that, too. You state at page 2 of your brief in 1538 that the board seems predisposed to invalidate the 088 patent. What record is evidence, is there, of the board's alleged prejudice? And you may have noted from my previous comment that I was disturbed by references to firing squad and death squad and so on. Again, Your Honor, that's general context. Those are things that have been stated. It's a general perception, I think it's fair to say. It's a new board. There's uncertainty and concern about it. Ultimately, we have to look with the final written decision of the board. To show its predisposition, to show its prejudice against you? I don't think we said that there was prejudice against us. You said it was predisposed to invalidate a patent. Well, I think based on what they did, I think that's a fair inference. So whenever a court rules against you, they're prejudiced? No, I wouldn't say that, Your Honor. No. Again, I find that kind of argument disturbing. When we look at what the board actually did, especially if you look at page 20, Are you referring to 20 of the board's opinion? Yes. Is that 5019? I'm looking at 5021. This is in the 1538 appeal. They made the same comment in both final decisions. They said that although the NIC's disclosure of page 9 does not indicate explicitly changing the coverage of beneficiaries to respective insurance policy occurs in real time, one of ordinary skill in the art would have appreciated such transactions may be instant in nature. The only references there are to Mr. Klausner's testimony. And the problem there was that Mr. Klausner had no insurance industry experience, never worked in it, didn't consult with anybody in that industry. And in a motion, in opposing a motion to exclude, Lurie said that he does not purport to testify as an expert on insurance matters. Lurie, what's your basis in your blue brief at 16 and 17 for saying that Mr. Klausner makes his living as a professional testifying expert? During his deficit from his CV. His CV says that he makes his living as a consultant and an expert.  But one thing he doesn't do is he doesn't have experience in the insurance industry and yet here he is offering an opinion about a person of ordinary skill in the art reading the NIC paper would infer that a real time adjustment of insurance policy would be advantageous. He doesn't have any background or experience, your honor, to know how adjustments were made back then. And Lurie did have an expert that had industry experience. That was Ms. O'Neill. He didn't even consult with her. And the other thing that Mr. Klausner did that we think was error is he didn't apply the board's claim construction. This court made clear in the Muni Auction case that when testifying in validity, an expert must compare the construed claims to the prior art. He never did that. His expertise was really in computer systems, designing computer systems. And basically his position comes down to, well, if somebody in the insurance industry tells me what they want, I can figure out how to program a computer to do it. But we have to look at what the NIC paper actually said. And again, the board said it doesn't explicitly indicate you change an insurance parameter like changing a beneficiary in real time. The only support was Klausner, who really is in no position to say how reading this paper, this is someone in the insurance industry would interpret that way. And then the board also relied heavily on page 8 of the NIC opinion, I'm sorry, NIC paper, where there's a reference to income transactions and communications. And in here, there's no description of what those transactions or communications are. Now, when you look at the entire paragraph, it's talking about what producers can do. A producer is defined in that paper to be an insurance agent, not the insurance company. It's the insurance company that makes the adjustments. Now, there are other places in the NIC paper where there's some transactions that are described that I think you could fairly say are instant, such as requesting receiving information to get directions to a repair facility, for example, when you go online and see how much your payment is due and making the payment. But an important point I'd like to make here, though, is the real-time adjustment of the insurance policy parameters described in the patent is not an instant transaction. The claims and the preferred embodiment, which is an exemplary of the claims, talks about a series of interactions where you go back and forth. The policyholder transmits information. The insurance company has to evaluate it. They might request further information. It's not until a number of transactions have been completed that the insurance policy parameter can be adjusted. And the patent even explains in the preferred embodiment that any time during that process, the policyholder can cancel and stop this. So even after there's been some transactions, that the insurance policy parameter is not adjusted. So we don't think that we think it was hindsight was used to read into instant transactions that that's a real-time adjustment of an insurance policy parameter. We believe that that hindsight was used by relying on Mr. Klausner, who didn't really have expertise in the insurance industry, and that the board did not give due consideration to Ms. Caccione, who actually worked in the insurance industry, was a contributor to the NIC paper, had firsthand knowledge of how people in the insurance industry understood the endorsement policy, changes to insurance policy, how they were done in 1998. And she testified that they wouldn't understand the NIC paper to suggest an instant or real-time adjustment of an insurance policy. So we think there's a lack of substantial evidence that the NIC paper discloses real-time adjustments of insurance policy. The board used hindsight to rely on that. Now, if I can go to claim interpretation, we think that there's also reversible error on the issue of claim interpretation, because the board adopted a broadest reasonable interpretation that was divorced from the specification and the record evidence. What the board did is they failed to tailor the use of this term, external process, that's used in a dictionary definition, to its meaning in the context of the patent. And by doing so, the board elevated these abstract words in the dictionary definition above the intrinsic evidence and legally erred. And Philip says that's legal error. We submit the correct instruction of actual time is that an external process that depraves actual time an external process occurs means during the same internet session. And that's what's disclosed in the patent. There's undisputed evidence from Dr. Jaffe. That's how one of Ornstein et al would interpret this. And the board's constructionist term matters, because it's a erroneous construction that opened the door to the board's application of hindsight in assessing obviousness. And that claim construction should frame the obviousness analysis. And without a proper context for understanding words like external process, one cannot understand what the time frame is for the action that must be performed during this external process. Now, here the NAC paper was not a technical paper. There were no flow diagrams, no technical description. It was purely aspirational. And it was talking about possible uses of what insurance companies might be able to do in the future, provided no details. I mean, it wasn't purely aspirational. I mean, the sentence at page 13 of NAC that is quite striking. It's not absolutely complete, but the last complete sentence on that page, in addition to obtaining quotes, customers currently have the ability from at least one auto insurer to complete the entire transaction online. Now, that doesn't say complete it in what you would call a single session, whatever exactly that means, but that's not aspirational. It suggests by implication that it's very, very far from widespread, but it exists. I would have a couple points to make in response to that, Your Honor. One, it's not really clear what this entire transaction is, although it's in the context of a paragraph that talks about buying insurance online, which is different than adjusting a policy. The other thing, there's really no disclosure to suggest how this is completed online. These can be completed online in many ways, and there's nothing to suggest, except hindsight, that this transaction is completed in real time. Again, whatever that transaction is. Is that what you're meaning by how in the real time? Well, that's not the technical innards of the communication protocols and stuff, which is not part of what you're claiming. Yes, yeah, and I would say it's part of the how. It's the real time, but again, the claim is not just directly directed or drafted broadly to real time adjustments. There's a number of specific software modules that require specific steps that must be executed in accordance with the limitations of the claims, and there's nothing here that helps bridge the gap between this generic statement and the claimed invention. All right. You're well into your rebuttal, so why don't we hear from you. Thank you, Your Honor. I'll reserve the rest of the rebuttal. Thank you. May it please the Court. The NAIC document gives four examples that show instantaneous adjustment and certainly suggest it and provide substantial evidence. Number one, they tell you there are instant transactions, and that's at A5096 in the 088, and the board concluded that that encompasses instantaneously adjusting an insurance policy parameter and credits Klausner. Then number two, the NAIC says automation vendors are already designing websites that allow you to determine the type and the amount of coverage and make changes in the policy, thereby establishing an insurance agency that's accessible to policyholders and consumers 24 hours a day. 24 hours a day you can make changes in your policy. Customers currently, third example, customers currently have the ability from at least one auto insurer to complete the transaction online. That's from A5101, and my previous example about automation and vendors was A5105. The fourth example is one insurer already had the ability to allow policyholders to make payments and extend the term and avoid cancellation when the offices were closed, A5102. It's not simply that you submitted a payment. You actually were able to make sure you had insurance going forward when the offices were closed. Now, is NAIC sufficiently technical? I would argue it is more technical than the disclosure in 088 and 269. If you take a look at the glossary, you will see how to build a website in a description that is more detailed than in the patent. If you look at the front of it, in A5091 and A5093-95, they give you a detailed internet commerce, accessing the internet, the World Wide Web. It explains how insurance policies are sold and serviced over the internet, A5095-97, and it even describes electronic applications, electronic signatures, and security, and that's at A5099-5101. Now, I'll notice Progressive in this argument, and often they like to ignore Lockwood. Lockwood was 1984. That is a program, a software program that went through a network that allowed you to go into a mall, a department store, and you could apply for, get quotes, make adjustments, and get a policy on the spot. And according to Lockwood, all in 1984, all carried out automatically. What was the objective of Lockwood? It was intended to give the impression that you were dealing with a live person, A5156. Now, what happens is Ms. O'Neill testifies, well, wait a minute. This idea that changes is more difficult than the new policy, that doesn't make any sense. When you're underwriting, you perform the identical functions. A large part of this is the same. And the board credited Ms. O'Neill's testimony, and in fact predictably uses prior art elements according to their established functions, an obvious improvement at A5029. And the board found that Liberty presented sufficient evidence that issuing new policies and adjusting existing policies involved many identical functions. That is at A5029. Now, what about Progressive's testimony? What did the board have to say about it, their findings, their fact findings? Number one, Progressive attempted to focus the board on distorted readings of selected passages. The signs for that, and they're multiple, are A5017, A5018, A5019, A5021-23, and that's from the 0885 final written decisions. What happened here was that Progressive linked their computer expert, Jaffe, to Cacchione, and that is in A7169. And then Cacchione testifies that the traditional way of handling underwriting was with e-mail, and sending e-mail and manual processing. And then Jaffe says, that I should say is at A7233. Then Jaffe relies on Cacchione as to the state of the art. So Jaffe, who'd written papers on real-time automation, suddenly says, oh, Cacchione says people use e-mail and manual processing, that is what I'm going to say is the knowledge of the insurance industry. Well, what was traditional is not the state of the art. They used the wrong legal standard for the whole basis for it. And Jaffe relies upon Cacchione for that. A7169. The board points out that it's not the correct standard, that's A5018-20. The board points out that Progressive fails to discuss the AIC disclosures as a whole, and that's A5017-19 and A5021-23. And the board correctly finds that Liberty Mutual's experts are more credible. The insurance expert Ms. O'Neill and Mr. Klausner at A5018-21. Let me reassure you that we've read the board opinion and we're intimately familiar, so you might, if you have anything else, I finished at that section with it, Your Honor, and I'd appreciate it. One last thing on the real-time client construction. Progressive represented to the board, they took the position that construction of the term real-time was, quote, not necessary to confirm patentability of the claims. That's at A6997. Progressive doesn't point to any portion of the specs that talks about the same online internet session. The broadest reasonable interpretation is the IEEE definition. And the board itself says Progressive is trying to add an unnecessary limitation here and we're confused about what the same online internet session would be. But most importantly, it doesn't matter. Because what the, this is a 103 obviousness. And NAIC says, wait a minute, you can make changes 24 hours a day when the office is closed. Lockwood allows you to do it on an automated basis. You can complete the entire transaction. And what we find is it would be obvious to be able to provide a website that would allow you to make real-time adjustments in the insurance policy no matter how you define real-time for purposes of this proceeding. I have no further points. Thank you. Thanks, John. Just a few points. Liberty just argued that its theory is that instant transactions, at least I understood it, that instant transactions encompass instant adjustments. They explained earlier adjustments are not instant. Adjustments are the result of a series of transactions that must be completed. Also, the NAIC paper in page 9 where it talks about transactions that four times that the insured communications insurance company, that's without internet service. Then it talks about what might happen in the future. One of the interactions, too, is making claims. It's undisputed that when a claim is made, an investigation must take place. So that can't be an instant transaction. And then on page 14, counsel referred to that section. The key words there, it talks about maintaining an existing policy, making payments to maintain an existing policy. Well, when you make the payment, you're not changing an insurance policy, a parameter of the policy. You're just fulfilling a contractual obligation to make the payments on the schedule that was agreed to. And then on Lockwood, first of all, Lockwood was not the basis for the board's decision to make an independent claim. It was just the dependent claim. And the only support for Lockwood is Ms. O'Neill's testimony in paragraph 40 where she just gives conclusory testimony that it would be advantageous to make changes online. Ms. O'Neill had experience in the actuarial part of the insurance industry. Now she's opining on the technology. And we submit that that's not substantial evidence. Okay. Final thoughts? Yeah, I want to apologize to the court that we made some arguments that the court found troubling. Lesson learned, just ask the court to, well, we apologize and we do want to focus on the merits of the case. And again, when we focus on the merits, we think there were some reversible errors on claim construction, lack of substantial evidence, and the legal conclusion of oddness. The lesson that you should learn is that if you make a statement that is unsupported, inaccurate, or hyperbolic, that it will cost you time to explain it. Thank you. The case is submitted and we thank all counsel for their participation.